Murry T. Morgan and Evangeline J. Morgan v. Commissioner.
Morgan v. Commissioner
Docket No. 59208.
United States Tax Court
T.C. Memo 1957-60; 1957 Tax Ct. Memo LEXIS 198; 16 T.C.M. (CCH) 262; T.C.M. (RIA) 57060; March 29, 1957
Martin W. Meyer, Esq., Munsey Building, Washington, D.C., and James W. Quiggle, Esq., for the petitioners. Donald W. Geerhart, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioners' income tax for the calendar year 1951 in the amount of $9,348.82. The issues for decision are (1) whether the petitioner Murray T. Morgan worked on the meat-curing process covered by his Mexican Patent No. 49835 for 36 calendar months; (2) if so, whether the payments received by him *199 in the taxable year pursuant to paragraph 4 of certain contracts granting to three Mexican companies the right to use this process constituted income from the patent; and (3) whether the petitioners are entitled to prorate any of the 1951 income from the three contracts in accordance with section 107(b) of the Internal Revenue Code of 1939. A Rule 50 computation will be necessary since the amount of Mexican income taxes accrued in 1951 has been stipulated to be greater than that claimed on petitioners' amended return. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners are, and were in 1949, 1950, and 1951, husband and wife, citizens of the United States, residing in Maryland. The income in question was earned by the husband who will hereinafter be referred to as the petitioner. Petitioner and his wife filed timely joint Federal income tax returns upon the calendar year basis for said years with the district director of internal revenue at Baltimore, Maryland. Their taxable net incomes for the taxable calendar years 1949, 1950, and 1951, excluding any amounts received with respect to petitioner's Mexican patent (hereinafter *200 described), were $9,848.76, $11,215.17, and $7,985.59, respectively. Petitioners have paid for said taxable years the following Federal income taxes: 1949
$ 1,859.64
1950
2,257.50
1951
28,336.83 Petitioners' income taxes for 1951 were paid on or before March 15, 1952, the last day prescribed for payment. Pursuant to section 276(b) of the 1939 Internal Revenue Code, petitioners and respondent herein executed on February 8, 1955, (within 3 years from the time petitioners' 1951 income tax return was filed) an agreement on Treasury Form 872, extending until June 30, 1956, the time prescribed in section 275, within which the respondent could make an assessment with respect to the taxes herein. Taxpayers elected to take credit for foreign income taxes upon the accrual basis for the taxable year 1951, during which a liability of $5,153.04 in income taxes accrued to Mexico. Petitioner has had 47 years' experience in the meat industry, has testified on different occasions as an expert witness for the internal revenue service in Tax Court cases upon methods of meat processing and marketing, and for some years prior to October 1, 1947, was employed by the U.S. Department *201 of Agriculture. During the last year of petitioner's employment by the Department of Agriculture his official duties involved no research or development in the meat processing field. On June 24, 1947, petitioner, who was employed at the time as a marketing specialist for the Department of Agriculture, attended a meeting at Albuquerque, New Mexico, for the purpose of finding the solution to the cattle crisis existing in Mexico. There the foot-and-mouth disease in cattle herds was prevalent and, inasmuch as Mexico had no meat inspection law with regulations conforming to the United States Meat Inspection Act, the United States had imposed a quarantine prohibiting imports of cattle from Mexico into the United States. This was the first time a quarantine had ever been imposed by the United States against importation of Mexican meat because of the existence of foot-and-mouth disease in that country. A drought also existed in Mexico which, together with the quarantine, had overstocked the ranges beyond their ability to supply pasturage. At the meeting officials and experts of both the United States and the Mexican Governments and leaders of the cattle industry on both sides of the border *202 were present. Further meetings upon the crisis were held at El Paso, Texas, on August 18 and 19, 1947. From the June 24 meeting there had resulted certain proposed solutions to the Mexican cattle crisis, and petitioner's official duties were to find outlets for Mexican beef and to spur development of canning and packing plants. Immediately after the El Paso conference, petitioner visited meat slaughtering and canning sites and proposed sites in the Mexican cities of Juarez, Chihuahua, Torreon, Cananea, and Magdalena for the official purpose of finding outlets for Mexican beef and assisting in the development of canning and packing plants. In further pursuance of these official duties, petitioner also conferred at length with ranch owners and community leaders to discuss Mexican cattle problems and methods of eliminating them. He returned from Mexico in August of 1947 and, resigning as of October 1, 1947, from U.S. Government service, opened an office in Washington, D.C., to specialize as a business consultant in meat and other foods. Petitioner first conceived the idea for a process for curing meat adaptable to Mexican beef when he was attending the meeting at Albuquerque on June 24, 1947. In *203 his application for a Mexican patent (hereinafter referred to) he describes his invention as relating "to the art of selecting, mixing, curing and preparing edible products derived from the slaughter of domestic animals for further processing into sausages, canned meats or other prepared food products * * *" and as being especially useful "in areas of warm climate." This process was in effect a combination of several other known processes. He made observations and thought about the process while working on the Mexican cattle problem for the Government, and also read books and other publications in the general field, but the process itself was never altered from that which he had kept in his memory since June 24, 1947. On October 14, 1948, petitioner asked John Morrell and Company, Ottumwa, Iowa, to prepare small meat samples in the manner he designated. The samples were submitted to the Bureau of Animal Industry, United States Department of Agriculture, where they received visual and laboratory inspection. Petitioner was told on June 19, 1949, that similar imported meat, if accompanied with proper certification and documentation (including a Mexican meat inspection certificate), *204 would probably be accepted for entry into the United States. In late December 1948 petitioner showed samples of meat, similar to those prepared by John Morrell and Company and presented to the Bureau of Animal Industry, to G. O. Mayer, vice president of Oscar Mayer and Company, at Madison, Wisconsin. Mayer arranged to make tests of products similarly prepared in the Oscar Mayer plant in Madison. Tests of petitioner's process had been heretofore on small samples under laboratory rather than actual importation conditions. Mexico had not yet enacted a meat inspection law and could not qualify as an exporting country. Shortly prior to December 27, 1950, the Mexican Government adopted a system of meat inspection comparable to that of the United States. Effective December 30, 1950, the United States Department of Agriculture added Mexico to the list of countries from which cured or cooked meats, covered by a foreign meat inspection certificate, could be imported into the United States. On September 1, 1952, the Secretary of Agriculture declared that foot-and-mouth disease no longer existed in Mexico. Argentina had both a meat inspection law and the foot-and-mouth disease and petitioner *205 was able to arrange a test there. Accordingly, petitioner prepared directions outlining all the steps in the test, and early in June 1949 a draft thereof was submitted to the Department of Agriculture. The representatives of the Department of Agriculture made suggestions which were embodied in new directions which were on June 17 sent to Buenos Aires. A packing plant in Argentina, operated under inspection regulations recognized by the United States Government, prepared according to petitioner's instructions 12 casks of meat each weighing 125 pounds. On July 14, 1950, petitioner secured the approval of the Inspection and Quarantine Division of the Department of Agriculture to import 2 casks to Kingan and Company, Indianapolis, for testing. On July 21, 1950, approval was granted to ship the other 10 casks to Oscar Mayer and Company for testing. Kingan and Company later became a large buyer of this type of processed meat. On September 15, 1950, Oscar Mayer and Company informed petitioner of the successful results of its tests and advised that the company wished to negotiate for the purchase of 500,000 pounds of meat prepared in accordance with petitioner's process. Petitioner filed *206 his application for a patent on the meat-curing process heretofore referred to with the Government of Mexico on September 19, 1949. In the filing of the application, petitioner's Washington attorneys, R. Rommel and his associated patent firm, Marks and Clerk, had used a firm of Mexican attorneys as correspondents. Until the patent was granted, a great deal of correspondence passed between petitioner and Rommel, largely in connection with the former's desire to expedite the patent application procedure. In early 1951, petitioner became apprehensive at the time consumed in securing his patent. In May of 1951, petitioner and his attorneys decided to change correspondents in Mexico, and on June 25, 1951, petitioner executed a power of attorney in favor of the Mexican firm of Goodrich, Dalton and Little, which would allow prosecution of the application by them on his behalf. On July 23, 1951, the patent, No. 49835, was granted, the date thereof in accordance with Mexican law relating back to September 19, 1949. The description of the process contained in the application for patent was not modified in any respect between September 19, 1949, and July 31, 1951, and was the same as conceived *207 in June 1947. On January 23, 1951, while the application for his patent was pending, petitioner entered into contracts with the following companies: Empacadora De Chihuahua, S.A., of Chihuahua, Chih., Mexico., Empacadora De C. Juarez, A.A., of Juarez, Chih., Mexico., and Ready Foods De Mexico, S. A., Empacadora De Carnes, of Torreon, Coah., Mexico. The pertinent parts of these contracts (identical in these respects) read as follows: "WHEREAS Vendor has knowledge of methods and techniques of meat processing and preserving acquired and conceived by him during his many years of experience in the meat packing industry; "WHEREAS Vendor has on file an application for patent in Mexico upon A Meat Product and Method of Preparing the Same; "WHEREAS Vendor is desirous of acting as an agent of Vendee in connection with the sale of meat processed and preserved according to the methods known by Vendor; "WHEREAS Vendee desires to avail itself of the oppontunity [opportunity] to most advantageously ship the meat and products derived from the slaughter of meat animals herein referred to, into the United States of America, in full conformity with regulations of the United States Bureau *208 of Animal Industry, or to other destinations either within or without the boundaries of Mexico. "NOW THEREFORE, for and in consideration of the premises and of the sum of Twenty-five Hundred Dollars ($2500.00), receipt whereof is hereby acknowledged by Vendor, and for other good and valuable considerations, it is mutually understood and agreed as follows: - "1) Vendor agrees to instruct Vendee in the methods of selecting, preparing, curing and otherwise processing meat and animal products by methods and processes known to Vendor and as outlined in an application for patent on file in Mexico. "2) Vendor agrees to instruct and acquaint Vendee in special methods of decharactericizing certain by-products derived from the slaughter of cattle, calves, sheep and lambs. "3) Vendee agrees to pay to Vendor in Washington, D.C., in United States funds a royalty of Fifty Cents ($0.50) per each 100 pounds of the first 2 1/2 million pounds of meat and animal products, Thirty-five Cents ($0.35) per 100 pounds for the next succeeding 2 1/2 million pounds thereof, and Twenty-five Cents ($0.25) per 100 pounds for all remaining quantities thereof, processed and prepared according to the processes *209 and methods herein referred to, on or before February 29, 1952. Vendee further agrees to pay Vendor a royalty of Fifty Cents ($0.50) per each 100 pounds of the 2 1/2 million pounds of such meat and animal products, Thirty-five Cents ($0.35) for the next succeeding 2 1/2 million, and Twenty-five Cents ($0.25) for remaining quantities produced in each 12 month period beginning March 1, 1952, based upon each 100 pounds sold. "4) It is agreed that if Vendor acts as Vendee's agent in the sale of such meat products, the royalties herein named shall be supplemented by a brokerage fee of one % of the sales price. * * *
"8) Vendor hereby grants to Vendee a non-exclusive and non-transferable license to manufacture and sell the product outlined in the aforesaid application for Mexican patent, according to the processes and methods therein outlined, and in and to any of the inventions therein set forth and in and to any patent or patents which may issue as a result thereof. * * *
"10) Vendor agrees to use diligence to prevent persons other than the Vendee herein mentioned from disregarding the provisions of the application for patent herein described, to the competitive disadvantage *210 of said Vendee. If, during any three month period Vendee has knowledge that more than 150,000 pounds of meat or animal products herein described are being shipped into the United States without payment of the royalties herein provided, the Vendee shall notify Vendor in writing that it is encountering undue hardship, and, at the end of 30 days it may cancel its obligations to Vendor under this agreement." * * *
During the year 1951 petitioner received the following payments under each contract: Under
Under
From
Paragraph 3
Paragraph 4
Chihuahua
$20,268.39
$15,671.18
Juarez
19,501.74
5,008.38
Ready Foods
14,474.96
None
$54,245.09
$20,679.56 The entire amount received under paragraph 4 of the above contracts was paid with respect to the purchase of meat by Oscar Mayer and Company, with the exception of $229.80 received with respect to a purchase by J. Minder & Company and $234.78 received with respect to a purchase by Ohio Provision Company. By letters dated August 28 and August 31, 1951, Ready Foods and Chihuahua advised that no more payments would be made under paragraph 3. Petitioner received a similar notice from Juarez, the third firm, *211 at approximately the same time. No amounts were received under paragraph 3 with respect to any shipments made after July 31, 1951. Payments were received under paragraph 4 of the Chihuahua contract with respect to shipments made through December 1951 and were for services as selling agent for the Mexican firms. Petitioner received no sums of money with respect to his Mexican patent in any year prior to 1951 nor in 1952. Records of the Bureau of the Census, United States Department of Commerce, show the following imports into the United States of beef and veal, pickled or cured: From the entire world:
1951
64,738,309 pounds
From Argentina: 1951
11,462,461 pounds
From Mexico: 1950
None
1951
47,749,267 pounds
1952
45,920,000 pounds
On February 17, 1955, petitioner sold his Mexican patent for $1,000. Opinion KERN, Judge: The principal issue to be decided is whether any of the income which the petitioner, Murray T. Morgan, received in 1951 under the three contracts with the Mexican meat processing companies can be prorated in accordance with section 107(b) [1] of the Internal Revenue Code of 1939. The petitioner argues that his work on his meatcuring *212 process began June 24, 1947, and ended June 25, 1951, thereby covering a period of over 36 months and qualifying the income derived in 1951 from the patent for the benefits of section 107(b). *213 We will assume, arguendo, that the payments received by petitioner from the Mexican companies under paragraph 3 of the contracts were made solely in consideration for their permission to use petitioner's "Meat Product and Method of Preparing the Same" covered by petitioner's application for a Mexican patent and constituting petitioner's claimed "invention", and that no part of the consideration for such payments consisted of instruction in petitioner's knowledge of other "methods and techniques of meat processing and preserving acquired and conceived by him during his many years of experience in the meat packing industry." If we did not make this assumption, we would be faced with a troublesome failure of proof since there is no basis in the record for making an allocation of the payments, part to the "invention" and part to any other methods and techniques known by the petitioner. We will also assume, arguendo, and contrary to Beardsley, Jr., v. United States, 140 Fed. Supp. 541, and the implications in Iliff David Richardson, 14 T.C. 547, that the work on the "invention" by petitioner began on the date in 1947 when he formed the mental conception of *214 his process rather than in 1949 when he seems to have first set out in writing all of the steps in his process. Even if we make these assumptions in favor of petitioner, we must nevertheless decide in favor of the respondent since we are unable to conclude that petitioner's work on this "invention" continued after September 19, 1949, when he filed his application for a Mexican patent. Accordingly, we must find that the work on the invention by petitioner did not cover "a period of thirty-six calendar months or more from the beginning to the completion of such * * * invention." The petitioner argues that the 36-month work period prescribed by section 107(b) extended until June 25, 1951, the date he executed a power of attorney to a Mexican patent law firm which allowed prosecution on his behalf of the original patent application. We are of the opinion that the work period of the petitioner on the invention, from which the income here involved was derived, certainly ended at or prior to the filing of his application for the Mexican patent. There was no change in the patent description following that date. The petitioner, however, argues that his work on the process was not completed *215 in 1949 when the patent application was filed and that the following 2 years of development work on the process should be considered as work done on the patent covering the invention. We cannot agree with this proposition, as it is clear that the petitioner had fully completed work on the invention of his process by the time of his application for a patent. At that point he possessed the "invention" or process which he licensed by the contracts with the Mexican firms and for which we have assumed he received the payments here in question. His efforts following the application for a patent were directed solely toward the commercial development of the process. Because we have held that the petitioner has not fulfilled the 36-month work period requirement, it is unnecessary for us to determine whether the payments made under paragraph 4 of the contracts were royalties on the patent or were for services of a different nature. Decision will be entered under Rule 50. Footnotes
1. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY. (b) Patent, Copyright, Etc. - For the purposes of this subsection the term "artistic work or invention", in the case of an individual, means a literary, musical, or artistic composition of such individual or a patent or copyright covering an invention of or a literary, musical, or artistic composition of such individual, the work on which by such individual covered a period of thirty-six calendar months or more from the beginning to the completion of such composition or invention. If, in the taxable year, the gross income of any individual from a particular artistic work or invention by him is not less than 80 per centum of the gross income in respect of such artistic work or invention in the taxable year plus the gross income therefrom in previous taxable years and the twelve months immediately succeeding the close of the taxable year, the tax attributable to the part of such gross income of the taxable year which is not taxable as a gain from the sale or exchange of a capital asset held for more than 6 months shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over that part of the period preceding the close of the taxable year but not more than thirty-six calendar months.↩